**Opinion issued May 19, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-14-00502-CR**

———————————

**JUSTIN WAYNE PARRIS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Case No. 1352699**

---

## MEMORANDUM OPINION

Appellant, Justin Wayne Parris, waived his right to a jury trial and was found guilty by the trial court of the offense of murder.[1] The trial court sentenced

---

[1]  *See* TEX. PENAL CODE ANN. § 19.02(b)(1),(2) (Vernon 2011).

Appellant to 70 years in prison. In one issue, Appellant contends that the evidence was not sufficient to support the judgment of conviction.

We affirm.

## Background

In June 2009, Appellant lived in a house with his 12-year-old sister, Danielle; his mother; and his 82-year-old grandfather, Johnnie Gonzales, who owned the home. Gonzales also owned the house next to his home and the house behind his home. Gonzales's ex-wife and his son, Thomas, lived in the house next door. Gonzales's son, Junior, and Junior's wife, Mary, lived in the house behind Gonzales's home.

Danielle and Gonzales had a very close relationship. Gonzales would walk Danielle to her school bus stop in the morning, and he would be there waiting for her in the afternoon to walk her home. On November 6, 2009, Gonzales was not waiting for Danielle when she got off the school bus. Danielle walked to a nearby store and called home. Appellant answered the phone. Danielle asked Appellant where Gonzales was, and Appellant responded that he did not know. Appellant told Danielle to walk home. It took Danielle about 20 minutes to reach home.

When she arrived at her house between 4:00 and 4:15, Danielle saw her Uncle Junior's truck parked in front of her Uncle Thomas's house next door. Junior's wife, Mary, was in the passenger side of the truck. Junior was standing

outside the truck speaking with Danielle's grandmother, who also lived in the house with Thomas. Danielle waived to them, but they did not waive back to her.

Danielle would later tell police that Appellant was sitting on the front porch of their house when she came home. Danielle asked Appellant where their grandfather was, and Appellant said he did not know.

When she walked in the house, Danielle noticed that her grandfather's recliner was tilted backwards, his footrest was flipped over, and mail was strewn across the floor. Although she feared that there had been a break-in, Danielle continued into the house. She walked through the dining room to the back patio door. There, on the floor next to the back sliding glass door, Danielle noticed a blanket on the floor. She started to pick it up when she noticed that her grandfather's left hand, with his watch, was sticking out from beneath the blanket. Danielle also saw that there was blood.

Danielle called 9-1-1, and Houston police officers, D. Dodson and G. Rodriguez were dispatched to the scene. The Houston Fire Department (HFD) was also dispatched, and it reached the scene first. When the police officers arrived, Appellant was being treated by HFD personnel for a cut on his hand. The firemen told the police officers that there was a scene inside the house that they needed to check. The officers proceeded inside the house and went to the rear of the home to where Gonzales's body was lying underneath a blanket. One of the HFD

personnel pulled back the blanket to reveal Gonzales's body. The officers saw that Gonzales had been decapitated. His head was lying one to two feet away from his body.

Officer's Dodson and Rodriguez then conducted a security sweep of the premises. The officers found no one else at home. The officers noticed that, not only was there blood around Gonzales's body, there was blood in the kitchen, the bathroom, and throughout the backyard. In the bathroom, there were blood droplets on the floor near the sink that were consistent with someone cleaning up. Officer Rodriguez noticed that there was clothing on the floor of the bathroom that appeared to have blood on them. There was a blood trail leading from the bathroom to the backyard. The officers also noticed that Appellant had what appeared to be blood stains on his shorts and on his shirt. There also appeared to be blood on his shoes.

The property had a detached garage in the backyard. The police found the door of the garage unlocked and entered to ensure that there were no other victims. There, the police found a pair of gardening shears. On the gardening shears was what Officer Rodriguez would later testify was "dried red material consistent with blood."

4

Appellant voluntarily went to the downtown police station with Officers Dodson and Rodriguez. There, Appellant agreed to give video-recorded statements to Detectives O. Chandler and J. Johnston of the homicide division.

Appellant first spoke to Detective Chandler. He told her that he was 22-years old. Appellant said that he did not have a job but was receiving social security disability payments. Appellant had jobs in the past but either had quit or had been fired. Appellant stated that he was prescribed three or four medications, but he had not taken them for several weeks because he did not like how they made him feel.

Detective Chandler asked Appellant what he had done that day. Appellant stated that he did not recall specifically what he had done but confirmed that he had been at home all day. He then stated that he had gotten up, smoked a cigar and had listened to music. Appellant said that he tried to "keep busy" doing work around the house. He told Detective Chandler that he had cut his hand doing the dishes. Appellant said that his mom, who also lived in the home, was in the hospital at the time. Appellant stated that he had spoken to her that day on the telephone. Appellant told Detective Chandler that no one had come to the house to visit that day. Appellant initially said that he did not see his grandfather, Gonzales, all day. He said that he did not know where Gonzales had been because he, Appellant, had been walking around outside the house that day listening to music.

5

Appellant told Detective Chandler that he did not know what had happened to his grandfather. Appellant said that he did not recall the last time he had spoken to his grandfather or the last time he had seen him.

Appellant stated that he was sitting outside the house when his sister, Danielle, came home from school. Appellant said Danielle had called 9-1-1 because she saw Gonzales on the floor. Appellant acknowledged that he had seen Gonzales lying on the floor. He told Detective Chandler that he had covered Gonzales with a blanket because he "didn't want to look at him no more." When Detective Chandler asked him why he had not called 9-1-1 when he saw his grandfather's body, Appellant stated it was because he did not want to talk about it.

Detective Chandler asked Appellant what kind of relationship Appellant had with his grandfather, and he initially answered "distant." Appellant then said that he had "nothing against" his grandfather. Appellant denied that he and his grandfather had a fight that day, and he denied killing his grandfather. When Detective Chandler asked Appellant why he had blood on his shirt and on his shorts, Appellant said that he did not know and that he did not want to talk about it.

After Detective Chandler concluded her interview, Appellant was also interviewed by Detective Johnston. The detective first asked Appellant how he had cut his finger. Appellant told Detective Johnston that he had cut his finger by cutting lemons from a tree in the yard with a saw.

6

Appellant then described what he had done that day. He indicated that he had gotten up around 9:00 that morning. He first smoked a cigar and listened to music. He said that he took a shower around 10:00. Appellant stated that his grandfather was not home when he woke up, but his grandfather came home later while Appellant was sitting outside. Appellant said that he and his grandfather did not speak that day. Appellant claimed that he sat outside until Danielle came home from school.

Appellant told Detective Johnston that he and his grandfather never argued. When the detective asked Appellant how he felt about his grandfather's death, Appellant stated that it would be sad not to have his grandfather around to help his family. He was also concerned about where he and his family would live. Detective Johnston asked Appellant why he had covered his grandfather up with a blanket, and Appellant responded that "you don't leave stuff like that."

Appellant consented to giving a saliva sample. He also agreed to give the clothes he was wearing to police.

Officers Dodson and Rodriguez drove Appellant back to his grandfather's house. They had been instructed to wait there in their patrol car until a search warrant could be issued. Once the warrant was issued, the officers went to the home and arrested Appellant, who was asleep.

Appellant was charged with murdering his grandfather. Appellant's competency to stand trial was reviewed in 2009 and in 2010, and he was found competent each time to stand trial. Appellant's competency was again evaluated in July 2012. At that time, he was found not to be competent to stand trial. Appellant was committed to an inpatient mental health facility where he received court ordered mental health services. In December 2012, the trial court found Appellant's competency to be restored and ordered the criminal proceedings to proceed. It was reported to the trial court in December 2013 that Appellant was not taking his psychoactive medication, prescribed during his inpatient treatment. In January 2014, the trial court signed an order permitting the involuntary administration of medication to Appellant.

Appellant waived his right to a jury, and the case was tried to the bench in June 2014. At trial, the State admitted the video-recorded statements Appellant gave to Detectives Chandler and Johnston and the recording of the 9-1-1 call.

In addition to the police officers involved in the investigation of the case, the State also called Gonzales's oldest son, Junior, and his granddaughter, Danielle to testify. Junior testified that he had a close relationship with his father. He also testified that, on more than one occasion, Danielle had called him to come to Gonzales's house. When he had arrived at Gonzales's home on those occasions,

Junior had observed Appellant "up to my dad, wanting to beat him up or hit him . . . ."

Junior also testified that, around 4:00 on the day of the murder, he had been talking to his mother in front of his brother, Thomas's house, which was next to Gonzales's house. At that time, Junior noticed Appellant sitting on the front porch and saw Danielle walking down the street toward the house. It was soon after this that Danielle discovered Gonzales's body in the house.

Danielle was 17-years-old at the time of trial. She acknowledged that, on the day of murder, she had told police that Appellant was sitting outside her grandfather's house on the front porch when she arrived home, as Junior had also testified. However at trial, Danielle testified that Appellant had not been sitting outside on the porch. She stated that Appellant had arrived home at the same time she did. Danielle testified that she saw him walking toward the home as she was arriving and that he then sat down on a chair on the porch.

In her testimony, Danielle also indicated that she had called home from near her bus stop. Appellant had answered the phone and had told her he did not know where their grandfather was. Danielle stated that it took her 20 minutes to walk home.

The State also presented the testimony of C. Head, a DNA analyst at the Houston Forensic Science Center. She tested the blood on the clothing Appellant

9

was wearing on the day of the murder. Head was able to obtain a DNA profile from the blood on Appellant's shorts. Appellant was excluded as a contributor to the blood. Gonzales, however, was not excluded as a contributor. Head's testimony indicated that the probability that the DNA belonged to unrelated, randomly selected individual, other than Gonzales, was one in 64 quintillion for Caucasians, one in 410 quintillion for African-Americans, one in 14 quadrillion for Southeast Hispanics, and one in 50 quintillion for Southwest Hispanics. Head testified that she could not obtain a sufficient DNA profile from the blood on Appellant's shirt or shoes to conduct a DNA analysis.

In addition, the State called the assistant medical examiner, Dr. Mary Lynn Anzalone, who had performed Gonzales's autopsy. Dr. Anzalone testified that Gonzales had sustained an estimated 48 "sharp force injuries" to his body, including 17 such injuries to his head and neck and 16 such injuries to his neck and torso. Dr. Anzalone stated that Gonzales had been "truly decapitated." She testified that she had determined that all of the injuries had occurred about the same time.

At trial, the State theorized that Gonzales was killed with the gardening shears that the police had seen in Gonzales's garage. Officer Rodriguez testified that it had appeared to him that the shears were covered with blood. The State was, however, unable to introduce the shears into evidence because the shears had

been seized by police without a search warrant. At trial, the State offered a pair of gardening shears for demonstrative purposes. The State showed Officer Rodriguez the gardening shears, and he testified that they were similar to the shears he had seen in the garage. Dr. Anzalone testified that Gonzales's injuries were consistent with having been caused by a tool such as the gardening shears offered by the State for demonstrative purposes.

After the State rested, the defense also re-called Danielle to testify. On direct examination, Danielle testified that Junior and Gonzales did not have a good relationship. Danielle stated that her grandfather had changed his will less than a year before his death, leaving all of his property to her. She stated that the other family members, particularly Junior, were upset by the change in the will. Danielle testified that she had witnessed a physical altercation between her grandfather and Junior in the backyard.

Danielle also testified that, after her grandfather's death, she had seen Junior rifling through items in her grandfather's bedroom. She stated that her grandfather kept his will in a black box in his bedroom. After she saw Junior in her grandfather's room, Danielle noticed that the box and the will were missing. Earlier in the trial, Danielle had also testified that Junior had initiated court proceedings to have her removed from her grandfather's home.

On cross-examination by the State, Danielle acknowledged that she had seen Appellant act violently toward her grandfather, and her grandfather act violently toward Appellant. Danielle acknowledged that she never told the district attorney's office that her uncle had an altercation with her grandfather or that she believed he had taken the will.

In its closing argument, the defense pointed out that, in his recorded statement, Appellant told Detective Chandler that he had not taken his medication that day. The defense argued that may explain why Appellant did not act appropriately when he found his grandfather's body. Specifically, it may explain why Appellant covered Gonzales with a blanket and did not call 9-1-1. Defense counsel argued that Appellant may not have been able to comprehend the seriousness of the situation, given that he was off his medication.

The defense also asserted that Junior was the only person with a motive to kill Gonzales. The defense pointed to Danielle's testimony, which had indicated that (1) the family was angry that Gonzales had changed the will to leave all of his property to Danielle, (2) Junior and Gonzales had a physical alteration, and (3) Gonzales's will went missing after Junior had been seen rummaging through Gonzales's room.

After closing arguments, the trial court found Appellant guilty of the offense of murder. Following the punishment phase, the trial court sentenced Appellant to 70 years in prison. This appeal followed.

**Sufficiency of the Evidence**

In his sole issue, Appellant asserts that the evidence is not sufficient to support the judgment of conviction.

**A.    Standard of Review**

We review the sufficiency of the evidence establishing the elements of a criminal offense for which the State has the burden of proof under a single standard of review. *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013) (citing *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010)). This standard of review is the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). *See Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013).

Pursuant to the *Jackson* standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational fact finder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *In re Winship*, 397 U.S. 358, 361, 90 S. Ct. 1068, 1071 (1970); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *Williams v.*

*State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We can hold evidence to be insufficient under the *Jackson* standard in two circumstances: (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense, or (2) the evidence conclusively establishes a reasonable doubt. *See Jackson*, 443 U.S. at 314, 318 & n.11, 320, 99 S. Ct. at 2786, 2789 & n.11; *see also Laster*, 275 S.W.3d at 518; *Williams*, 235 S.W.3d at 750.

The sufficiency-of-the-evidence standard gives full play to the responsibility of the fact finder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). An appellate court presumes that the fact finder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793.

In our review of the record, direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton*, 235 S.W.3d at 778. Finally, "[e]ach fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

**B. Elements of the Offense**

As charged in the indictment in this case, the State was required to prove that Appellant intentionally or knowingly caused Gonzales's death, or that Appellant intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Gonzales's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1),(2) (Vernon 2011).

**C. Analysis**

The evidence offered at trial was sufficient to prove, beyond a reasonable doubt, each element of the offense of murder. Appellant, by his own statement to police, admitted that he was at home all day on the day of his grandfather's murder and that no one else had visited the home that day. Appellant admitted that he saw his grandfather come home that day but denied interacting with him. Appellant denied knowing what had happened to Gonzales but admitted to covering his grandfather's body with a blanket because he did not want to look at it. Appellant stated that he did not call 9-1-1 because he did not want "to talk about it." We note that, the trial court, as the finder of fact, was free to believe the inculpatory portions of Appellant's statement and to disbelieve the exculpatory portions. *See Trenor v. State*, 333 S.W.3d 799, 809 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (noting jury free to believe or disbelieve all or part of appellant's statements).

Junior and Danielle testified that Appellant had been violent toward Gonzales in the past. The evidence also showed that Appellant had fresh cuts on his hand that were treated by HFD on the scene. Appellant asserts in this brief that nothing refuted his claim that he had cut his finger either doing dishes or cutting lemons from a tree. However, the record shows that he told inconsistent stories to the police about how he cut his finger. He told Detective Chandler that he cut his finger doing dishes, and he told Detective Dodson that he cut his finger cutting lemons from a tree with a pruning saw. Detective Johnston also indicated that the cut was not consistent with having been made by a pruning saw.

In addition, the evidence showed that the blood found on Appellant's shorts was, in all statistical probability, Gonzales's blood. The responding police officers saw blood on the bathroom floor consistent with someone attempting to clean up. There was a blood trail leading through the backyard. In the backyard, the police found gardening shears in the garage with what appeared to be blood on them. The assistance medical examiner testified that Gonzales's injuries were consistent with having been caused by gardening shears.

In his brief, Appellant points out that the 9-1-1 recording shows that he had also spoken to the operator. He told the operator that he had come home to find his grandfather. He points out that he did not tell the operator that he had been at home all day. Danielle also told the operator that she and Appellant had arrived

home to find Gonzales. Danielle testified at trial that Appellant had arrived home at the same time she did that day. In contrast to these statements, Appellant, in his recorded statements, told the detectives that he had been home all day either inside the home or outside in the front of the home.

Additionally, Danielle testified that she had called the house 20 minutes before she arrived home that day. Appellant had answered the phone and had told Danielle that he did not know where Gonzales was. Junior also testified that he saw Appellant sitting on the front porch at the time Danielle arrived home from school. From this evidence, the trial court, as factfinder, could have reconciled any conflicts in the evidence and believed that Appellant was at home all day on the day of the murder. *See Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000).

Appellant also asserts that he may have gotten Gonzales's blood on his shorts when he was covering Gonzales's body with the blanket. He claims that, given the nature of the offense, there should have been more blood on his clothing than was found on them. Appellant acknowledges that Officer Rodriguez remembered seeing a pile of clothing in the bathroom with what appeared to be blood on them, but he points out that no other evidence regarding that clothing was admitted at trial. In any event, the trial court was free to make reasonable inferences regarding the evidence, including the inference that the blood was

transferred to Appellant's shorts when he stabbed Gonzales. *See Hooper,* 214 S.W.3d at 13.

Next, Appellant asserts that his recorded statements show that he had "borderline intellectual functioning." Appellant points to his medical records as support for this assertion; however, Appellant's medical records were admitted during the punishment phase, not during the guilt-innocence phase of trial. Appellant also points to his demeanor during his statements and the simplicity of his answers, as an indication that he lacked intellectual functioning. Appellant asserts that his conduct of covering up his grandfather with a blanket and other actions, such as allowing Danielle to enter the home to find her grandfather's body and agreeing to speak to the police, showed a lack of understanding of the gravity of the situation. He avers that "[h]is actions in making . . . are more consistent with a lack of understanding of the situation, rather than evidence of guilt."

As the sole judge of the weight and credibility of the witnesses, it was within the province of the trial court to weigh the evidence, and to draw reasonable inferences from the facts. *See Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). This would include a determination of whether Appellant's actions, his answers to the detective's questions, and his demeanor during the interviews indicated a lack of understanding of what occurred on the day of the murder or whether his actions and answers were evidence of his guilt.

Lastly, Appellant points to evidence supporting the defense's theory that Junior killed Gonzales. However, as stated, it was for the trial court to weigh the evidence and make reasonable inferences therefrom. *See id.*

Viewing the evidence in a light most favorable to the verdict, we conclude a rational fact finder could have found, beyond a reasonable doubt, each element necessary to support the finding that Appellant committed the offense of murder. Accordingly, we hold that the evidence was sufficient to support the judgment of conviction.

We overrule Appellant's sole issue.

## Conclusion

We affirm the judgment of conviction.

Laura Carter Higley
Justice

Panel consists of Justices Higley, Bland, and Massengale.

Do not publish. TEX. R. APP. P. 47.2(b).